**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHARLES ALLAN REY and | ) | No. 04-35040 (substantively consolidated |
| DOLORES ANN REY, *et al.*, | ) | with Nos. 04-22548 and 06-4487) |
| | ) | |
| Debtors. | ) | Judge Goldgar |

**MEMORANDUM OPINION**

Before the court for ruling is the motion of unsecured creditors Vertrue Incorporated, NewSub Magazine Services, LLC, and Gift Services, LLC, to convert this substantively consolidated chapter 11 case to a case under chapter 7, to dismiss the case, or to appoint a chapter 11 trustee. The motion is fully briefed and ready for decision. For the reasons that follow, the motion will be granted, and the case will be converted to chapter 7.

**1. Background**

The factual background here, especially the procedural history, is regrettably complex. Complexity notwithstanding, however, no facts are in dispute. No evidentiary hearing is necessary, and no party (including the debtors) has requested one. The following facts, as well as other facts mentioned later, are drawn from the parties' papers, from other materials in the record (including the debtors' petitions, schedules, and operating reports), and from the record in related litigation pending in the district court.

**a. The Reys and Heartland**

Debtor Charles Rey owns and operates a host of companies in the business of marketing products through direct mail promotion, including the placement of advertising inserts in credit

card invoices. These companies include Heartland Direct, Inc., Lifetime Marketing, Inc., Rey Marketing, Inc., and a couple of others not relevant here. Rey's wife and co-debtor, Dolores Rey, and the Reys' sons are variously officers, employees, or shareholders of the different entities. (The precise positions and ownership interests the Reys and their sons hold are also irrelevant.)

In the 1990s, Heartland entered into two agreements with Vertrue. Under the Vertrue agreements, Heartland marketed Vertrue's products and services to the customers of various oil companies, including Chevron, receiving in return a commission on the sales revenue. NewSub Magazine Services and Gift Services (collectively, "NewSub") had a similar arrangement with Heartland under agreements of its own. Disputes eventually arose under the agreements, with Vertrue and NewSub claiming that the Reys had made off with large sums of money, sums that should have been paid to Vertrue and NewSub. The disputes resulted in litigation between Vertrue and Heartland in the state courts of Connecticut and between NewSub and Heartland in the district court in Chicago.

### b. The Heartland Bankruptcy

In 2004, the district court entered summary judgment on liability against Heartland on two counts of NewSub's complaint, and Heartland filed for chapter 7 bankruptcy protection. The only assets of any size listed in Heartland's schedules were accounts receivable from Chevron and Vertrue and a potential counterclaim against NewSub. The trustee must not have been persuaded that these assets were worth pursuing, because in May 2005 he filed a no-asset report. The case was closed the next day. Heartland is no longer in business.

**c. The Rey Bankruptcy**

One month after Heartland's bankruptcy filing, NewSub amended its complaint in the district court action to add as defendants Lifetime Marketing, Rey Marketing, the Reys themselves, and one of the Reys' sons. The amended complaint contained a new count seeking to pierce the corporate veil between the Reys and the various corporations.

Finding themselves embroiled in the district court action, in September 2004 Charles and Dolores Rey filed their own bankruptcy petition under chapter 11. In their schedules, the Reys listed as their principal assets three parcels of real property: a residence in Glenview, Illinois, a residence in Hilton Head, South Carolina, and a commercial building in Skokie, Illinois. The Hilton Head residence is lavish – a 5,400-square foot, 6-bedroom, 7-bathroom, beachfront house that the Reyes valued at $3 million. The only other assets were approximately $160,000 in personal property, including $15,000 in "furs and jewelry."

From the start, the Rey bankruptcy has been exceptionally contentious. Creditors quickly moved to modify the stay on all three of the properties, the motion on the Glenview property almost going to trial before it was resolved. There have been a multitude of claims from creditors and objections to claims from the Reys. In particular, both Vertrue and NewSub submitted claims to which the Reys objected, and both Vertrue and NewSub also filed adversary complaints against the Reys. The Vertrue and NewSub adversary proceedings and the accompanying claim objections have been hotly contested. NewSub also filed a motion and then (at this court's suggestion) an adversary complaint seeking substantive consolidation of the Reys' estate with all of the non-debtor corporations as well as a non-debtor trust that appears to hold the Hilton Head property. A motion to dismiss that complaint was recently denied.

At last count, the docket in bankruptcy (not counting the adversary proceedings) was 34

pages long and had 318 entries. The original disclosure statement and plan are well out of date, and with so many issues still unresolved the Reys are not close to proposing new ones.

### d. Liquidation of the NewSub Claim

In December 2005, the parties informed this court that the district court was anxious to conclude the NewSub action. Believing that the issues raised by NewSub's veil-piercing claim in the district overlapped with the issues in NewSub's substantive consolidation adversary here, and hoping that a resolution of the district court action might decide some of the common issues, in December 2005 this court lifted the stay to permit NewSub to liquidate its claim in the district court. Proceedings in the substantive consolidation action and the Reys' objection to NewSub's claim were stayed.

NewSub's action in the district court was tried in late March 2006. Following trial, the court ruled that Heartland owed NewSub $1,118,056. Concluding further that Charles Rey was the alter ego of Heartland and the other corporations, the court ruled in favor of NewSub on its veil-piercing claim  In particular, the court found that "there was almost no trace of corporate formality" in the operation of the corporations, that Rey made no distinction "between his own personal assets and those of the three corporations," and that he had engaged in the "diversion of corporate funds for personal use." On March 20, 2006, the district court accordingly entered an order granting judgment in favor of NewSub and against Charles Rey, Rey Marketing, and Lifetime Marketing, jointly and severally, for $1,118,056.

### e. The Lifetime Marketing Bankruptcy

The district court's order had two consequences. First, on April 21, 2006, Lifetime Marketing filed its own chapter 11 petition. The assets listed in Lifetime Marketing's schedules

-4-

are minimal: two cars, some computers, and $161,622 in inventory described as "Chevron Replica Products," the latter encumbered by liens of UPS Capital Business Credit. The balance of the company's checking account was shown as overdrawn and having a value of "0.00." The schedules also listed as assets a variety of contingent and unliquidated claims, including claims against Citicorp, against UPS, against something called "BRG," and against something else called "Digital Planet."

Although Lifetime Marketing was an operating business earlier in 2006 – its statement of financial affairs lists 2006 income through the petition date of nearly $500,000 (up from a mere $63,000 in 2005) – that no longer seems to be the case.[1] The company's cash collateral motion, which had been granted on a periodic basis, has now been withdrawn, leaving the company with no ability to use its cash. Not that it has any to use: although a small amount of money came in after the bankruptcy petition was filed, the latest operating report for the month ending June 30, 2006, reveals that Lifetime Marketing's bank balance is again zero. In its recent motion, Citicorp asserts that Lifetime Marketing is in default under its agreements and owes Citicorp $80,000.[2]

---

[1] All of the income appears to have consisted of proceeds from agreements with Citicorp and Citibank (collectively "Citicorp"). Under the agreements, Lifetime Marketing placed advertising inserts in Citcorp credit card mailings, some mailings for general purpose credit cards, others for private label or oil company cards. The inserts advertised products credit card customers could purchase from Lifetime Marketing. In March 2006, Citicorp sent out mailings including Lifetime Marketing inserts offering an Emerson clock radio and a toy Citgo tanker truck. In a motion recently filed with this court, Citicorp says it stopped the mailings after Lifetime Marketing failed to demonstrate its ability to perform its contractual obligations by timely providing its 2005 financial statements.

[2] Although Lifetime Marketing was still in business shortly after the bankruptcy was filed, the company's existence was hand-to-mouth. The three-week budget submitted with the cash collateral motion on April 21 projected beginning cash in the first week of just $20.20. The budget did project $10,000 in revenue that week, all of it proceeds from the Citicorp agreements, as well as $20,000 more in revenue the second week. During the second week,

### f. Substantive Consolidation

The other consequence of the district court's order was that on June 7, 2006, debtors Charles Rey, Dolores Rey, and Lifetime, along with non-debtor Rey Marketing, consented to entry of an order substantively consolidating their estates into the Rey bankruptcy estate and permitting their treatment as a single bankruptcy estate. Also substantively consolidated by the same order was the bankruptcy estate of Heartland.

### g. The Heartland Bankruptcy *Redux*

Heartland's bankruptcy had been reopened in May on Heartland's own motion and the case converted to chapter 11. The goal in reopening the Heartland bankruptcy, according to the motion to reopen, was to facilitate substantive consolidation with the other bankruptcies. More probably, the purpose was to allow Heartland to pursue an action against Chevron, an action that Heartland claimed in the motion was previously "unknown." At the time it sought to reopen the bankruptcy, Heartland had in fact already filed the action in Illinois state court, and Chevron had removed the action to the district court. Once the bankruptcy was reopened, Heartland amended its Schedule B to disclose the claim, valuing it at some $14,000,000.

### h. The Motion to Convert or Dismiss

On June 21, 2006, two weeks after entry of the substantive consolidation order and almost two years into the Rey bankruptcy, Vertrue and NewSub moved to convert the bankruptcy case to chapter 7 or to dismiss the case – the motion currently under consideration.

---

however, almost all of the $30,000 Citicorp revenue was to be used for business expenses (mostly salaries and insurance payments), leaving projected beginning cash for the third week of just $169.20. At best, Lifetime Marketing was treading water.

Much of the motion is taken up with contentions that the estate has been mismanaged, contentions based on the district court's veil-piercing findings. Vertrue and NewSub also assert that the estate is diminishing in size, that there is no possibility of rehabilitation or confirmation of a plan, and that the debtors have unreasonably delayed the case to the detriment of creditors. Therefore, Vertrue and NewSub contend, either conversion or dismissal of the case is warranted (though conversion is the focus) under sections 1112(b)(1), (2) and (3) of the Code. The motion also includes a short, alternative pitch for appointment of a chapter 11 trustee.

### i. The Operating Reports

In the motion, Vertrue and NewSub offer a further reason to convert or dismiss. They note that the Reys failed to submit any of the required operating reports since the report for March 2005. Nine days after the motion to convert or dismiss was filed, the Reys suddenly produced a year's worth of operating reports – for June 2005 through May 2006. Each of the reports was hand-written by Charles Rey and appeared to have been hastily scrawled, although each was dated roughly around the time it should have been submitted. The debtors have not explained why the reports were not filed earlier if indeed they were timely prepared.

The motion to convert or dismiss was presented on June 12, 2006, and a briefing schedule set. At the initial presentation of the motion, UPS Capital, a secured creditor, voiced its support for the motion. So did the U.S. Trustee, who noted that despite the recent flurry of filings two operating reports were still missing, and the U.S. Trustee's fees were delinquent as well. Four days later, the debtors filed the two missing reports. They also filed separate reports for Heartland, Lifetime Marketing, and the Reys for May 2006 and the first week of June, and later they filed a combined report for these four debtors covering the rest of June. (The delinquent U.S. Trustee's fees were paid as well). No operating report, however, has yet been

-7-

submitted for debtor Rey Marketing. Rey Marketing has never filed schedules or papers of any kind in this case.

### 2. Analysis

Section 1112(b) of the Bankruptcy Code permits the bankruptcy court, on request of a party in interest or the U.S. Trustee, to dismiss a chapter 11 case or convert the case to one under chapter 7 for "cause." 11 U.S.C. § 1112(b). The pre-2005 version of the statute, applicable here, lists ten examples of "cause." 11 U.S.C. § 1112(b)(1)-(10). But the list is not exhaustive, and the court is free to consider other factors and use its equitable powers to reach an appropriate result. *See In re All Denominational New Church,* 268 B.R. 536, 538 (B.A.P. 8th Cir. 2001).

If "cause" is shown, the choice of conversion or dismissal depends on which is "in the best interest of creditors and the estate." 11 U.S.C. § 1112(b). Whether to dismiss, convert, or do neither is a decision committed to the bankruptcy court's "broad discretion." *In re Woodbrook Assocs.,* 19 F.3d 312, 316 (7th Cir. 1994).

### a. The "Gross Mismanagement" Problem

As a preliminary matter, it should be noted that the district court's findings from the NewSub action supply no "cause" to convert or dismiss. Those findings unquestionably show mismanagement by the Reys of the three corporate debtors, and gross mismanagement at that. But although "gross mismanagement of the affairs of the debtor" was and still is a ground for appointment of a trustee under section 1104(a)(1), *see* 11 U.S.C. 1104(a)(1), no decision appears to hold that gross mismanagement, pre- or post-petition, is "cause" to convert or dismiss under

section 1112(b). Nor have Vertrue and NewSub cited such a decision.[3/]

Even if gross mismanagement were "cause," moreover, the district court's findings would have no preclusive effect here. For issue preclusion to apply (since claim preclusion plainly does not), the judgment in question must be final, at least in the court rendering it if not on appeal. *See Old Republic Ins. Co. v. Chuhak & Tecson, P.C.,* 84 F.3d 998, 1000-01 (7th Cir. 1996); *Amcast Indus. Corp. v. Detrex Corp.,* 45 F.3d 155, 158 (7th Cir. 1995). A judgment is not final, however, if any claims against any defendants are left pending. *See* Fed. R. Civ. P. 54(b); D. Knibb, *Federal Court of Appeals Manual* § 2.3 at 30 (2000). The amended complaint in the district court named Dolores Rey and Charles Rey, Jr. as defendants, and both answered. The docket from the action reflects no disposition of the claims against them, and the transcripts from the action the parties have supplied offer no further enlightenment. The only possible conclusion on the current record is that the claims are still pending, and the judgment is not final.

The findings of mismanagement would not be binding, then, even if they were relevant.

### b. "Cause" to Convert or Dismiss

That said, however, the record clearly establishes three grounds to convert or dismiss – two under subsections of section 1112(b), and one under the case law.

---

[3/]   "Gross mismanagement" does not appear in section 1112(b) as a ground for conversion or dismissal, *see In re Jessen,* 82 B.R. 490, 495 n.1 (Bankr. S.D. Iowa 1988) (making this observation), and the 2005 amendment adding "gross mismanagement" to section 1112(b) as a ground, *see* 11 U.S.C. § 1112(b)(4)(B), suggests that it was not a ground before 2005. The amendment also refers to "gross mismanagement of the *estate*," arguably rendering pre-petition mismanagement irrelevant. *Id.* (emphasis added).

### i. Section 1112(b)(1)

First, there is "cause" to convert or dismiss under section 1112(b)(1). That provision permits conversion or dismissal if there is "a continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation" 11 U.S.C. § 1112(b)(1); *see generally In re Original IFPC Shareholders, Inc.,* 317 B.R. 738, 742-43 (Bankr. N.D. Ill. 2004). To satisfy this section 1112(b)(1), both conditions – loss to or diminution of the estate *and* no reasonable likelihood of rehabilitation – must be present. *Id.* at 742.

Both are present here. To begin with, the consolidated bankruptcy estate has limited value, and its value is declining. Of the various debtors, only the Reys have assets of any magnitude. Heartland has no assets. Lifetime Marketing has no money in the bank and little else in the way of property: just the two cars and $161,262 of "Chevron Replica Products," the latter encumbered by a security interest and probably worthless anyway given Heartland's action against Chevron. Nothing in the record suggests Rey Marketing has any assets either.

Other than the furniture, jewelry, cars, and whatnot, the principal assets of the estate are the three Rey properties, one in South Carolina and two in Illinois. But the two Illinois properties have already been sold post-petition. With those two properties gone, the South Carolina beach house and the assorted items of personal property are the only assets left to pay creditors. As time passes, however, the mortgage debt on the beach house (principal, interest, and taxes) continues to rise, and so the value of the property for creditors other than the mortgage company continues to decline. The property has been listed for sale for two years without success, and by agreement of the debtors the stay will lift in early 2007 to permit the mortgagee to foreclose. In short, the estate here is small and getting smaller.

Just as the estate is continuing to diminish, there is no reasonable likelihood of

rehabilitation here. This element "is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort." *IFPC,* 317 B.R. at 742 (internal quotation omitted).

The answer to that question here is no. No evidence shows that any of the three debtor corporations is even in business. Rey Marketing does not seem to be operating: no operating reports have been filed for Rey Marketing since the substantive consolidation order, and it was conceded in the NewSub action that the corporation had been dissolved in 1998.[4/] Lifetime Marketing is out of business: it has no cash and no ability to use any cash it receives. And Heartland has been dead in the water for years. There is no business enterprise to be saved here.

Chapter 11 is not limited to businesses, of course, and is available to individual debtors trying to "save the house."[5/] *See Toibb v. Radloff,* 501 U.S. 157, 160 (1991). But the Reys are in no position to save theirs. A review of the operating reports for May 2005 through June 2006 shows that the Reys had a negative bank balance in May 2005 that became positive in June only because the Skokie property was sold. This was followed by a sharp decline when the Reys paid their lawyers and a slow decline thereafter. The operating reports display the same pattern – spike, sharp decline for payment of attorney's fees, and then slow decline – with the Glenview sale in December. The property sales have been the only real cash infusion here in over a year: apart from the sales income, the Reys reported just $33,911 in "receipts from operations," source

---

[4/] Corporate information available from the website of the Illinois Secretary of State (http://cdsprod.ilsos.net/corp.html) confirms the 1998 dissolution of Rey Marketing. *See Denius v. Dunlap,* 330 F.3d 919, 926 (7th Cir. 2003) (holding federal court may take judicial notice of information on official government web site).

[5/] The contrary statement in *In re Del Monico,* No. 04 B 28235, 2005 WL 1129774, at *4 (Bankr. N.D. Ill. May 13, 2005), quoted by Vertrue and NewSub in their motion to convert or dismiss, is incorrect.

unknown, for the 12 months beginning May 2005. That is an average of only $2,800 per month. One month, the Reys had income of just $300; another month, their income was just $100.

The recently-filed operating reports really tell the story in this case. They demonstrate that the Reys are not reorganizing at all. Rather, they are simply surviving by liquidating the few assets of the estate with one hand, holding off their creditors with the other. Proceeds from the asset sales are financing both: the lawyers get paid to continue the bankruptcy and stall the creditors, while the Reys get to live off the rest, rent-free on the South Carolina beach.

The Reys' minimal prospects do not justify continuation of a chapter 11 bankruptcy and its considerable costs. With both statutory conditions satisfied, there is "cause" to convert or dismiss under section 1112(b)(1).

### ii. Section 1112(b)(2)

For much the same reasons, there is "cause" to convert or dismiss under section 1112(b)(2), permitting conversion or dismissal if the debtors have an "inability to effectuate a plan." Dismissal or conversion under section 1112(b)(2) is proper "if the court determines that it is unreasonable to expect that a plan can be confirmed . . . ." *Woodbrook,* 19 F.3d at 316 (internal quotation omitted); *see also IFPC,* 317 B.R. at 743.

It is unreasonable to expect that the debtors here can confirm a chapter 11 plan because there is *no* reason to believe they can fund one. The three corporate debtors are out of business. The individual debtors, meanwhile, have minimal income, and the source of that income is a mystery. They are living in their major asset, and that looks to disappear in a matter of months. In the face of conversion or dismissal, the debtors have failed to explain how they can confirm a plan and what gives them any realistic chance of reorganizing. And small wonder: the bankruptcy is nothing but a holding action. The debtors are "hoping merely to stave off the evil

day when the creditors take control of [their] property." *In re James Wilson Assocs.,* 965 F.2d 160, 170 (7th Cir. 1992).

The many claims listed as assets in the debtors' schedules – some potential, others now in litigation – do not improve the debtors' dim prospects for confirming a plan. To confirm a plan, a debtor's "income projections must be based on concrete evidence and must not be speculative or conjectural." *In re Ames,* 973 F.2d 849, 851 (10th Cir. 1992) (internal quotation omitted) (discussing chapter 12); *In re Cherry,* 84 B.R. 134, 139 (Bankr. N.D. Ill. 1988). A lawsuit's outcome, though, is always speculative. Without a solid basis for believing litigation is highly likely to generate large sums of money quickly, it cannot provide a sufficiently reliable source of income to support confirmation. *See, e.g., In re Burford,* No. 88-00364-C(T), 1991 WL 237820, at *1 (Bankr. N.D. W. Va. April 15, 1991) (denying confirmation where plan depended "almost entirely [on] speculative recovery from various lawsuits"); *Cherry,* 84 B.R. at 139 (same).

No reason has been given to believe the claims of the debtors here have particularly good prospects, or that victory, should it come at all, would come quickly.[6] In fact, the debtors have not even argued that a plan could be funded through their litigation efforts. The various claims they list are not enough to avoid conversion or dismissal. *Cf. In re Silverstein,* 94 B.R. 284, 290 (Bankr. E.D.N.Y. 1988) (converting case to chapter 7 where debtors were merely trying to "hold off their other creditors while waiting for the resolution of their litigation with Prudential").

Because the debtors have no reasonable possibility of confirming a plan, there is "cause" to convert or dismiss under section 1112(b)(2).

---

[6] The largest claim, the claim against Chevron, seems especially doubtful after the recent decision in *Cannon-Stokes v. Potter,* 453 F.3d 446, 448 (7th Cir. 2006).

### iii.  Operating Reports

Under the case law, finally, the Reys' failure to submit timely operating reports is "cause" to convert or dismiss the case, as well.

Monthly operating reports "are much more than busy work imposed upon a Chapter 11 debtor for no reason other than to require it do something." *In re Berryhill,* 127 B.R. 427, 433 (Bankr. N.D. Ind. 1991).  They are "the life blood" of chapter 11, enabling creditors to keep tabs on the debtor's post-petition operations.  *Id.*  Failure to file them – and file them timely – is a serious breach of the debtor's fiduciary obligations and "undermines the Chapter 11 process." *All Denominational New Church,* 268 B.R. at 538.  It is well established, consequently, that a debtor's failure to submit monthly operating reports is "cause" to convert the case or dismiss it. *Id.*; *In re Brauer,* 80 B.R. 903, 912 (N.D. Ill. 1987); *Berryhill,* 127 B.R. at 433.

The Reys filed no monthly operating reports for more than a year, better than half the life of this two-year old case.  Operating reports would undoubtedly have continued to go unfiled had the moving creditors not pointed out in their June motion to convert or dismiss that the reports were missing, prompting the Reys to file a year's worth of reports at once.  Even so, the operating reports were not complete, and it took the U.S. Trustee's observation in July that two months of reports were still missing to spur the Reys to file them.

That the reports were eventually filed, that the debtors now appear to be current, makes little difference.  A debtor-in-possession has a fiduciary obligation to its creditors to file the reports on time, and "[n]either the court nor creditors should have to coerce or implore a debtor into fulfilling the obligations imposed on it." *Berryhill,* 127 B.R. at 433.  For this reason, courts have not hesitated to dismiss or convert cases when a debtor was seriously and repeatedly delinquent although the debtor ultimately managed to bring its reports current.  *See, e.g., Brauer,*

-14-

80 B.R. at 905 (affirming dismissal although debtor had brought in eight months of reports at the last minute); *Berryhill,* 127 B.R. at 433; *In re Vallejo,* 77 B.R. 365, 367 (Bankr. D. P.R. 1987).

The reports are in any case not the kind designed to instill confidence in creditors or the court that the information they contain is reliable and the estate is in good hands. All of the reports are handwritten, many of them messily so. In some instances, items such as bank names are left blank. Several of the reports have figures written in and then crossed out. Although, as observed earlier, the reports are dated close to the time they were due, Charles Rey most likely pulled an "all-nighter" to get them filed. *Brauer,* 80 B.R. at 910. The operating reports are further evidence that the Reys have no serious interest in reorganizing and are simply holding their creditors at bay as long as they can.

The failure of the Reys to submit timely operating reports is still further cause to convert or dismiss this case.

### c. Conversion or Dismissal

Although "cause" to convert or dismiss has been established, the question remains under section 1112(b) whether conversion or dismissal – or neither – is "in the best interest of creditors or the estate." 11 U.S.C. § 1112(b).

What is in the best interest of creditors "is a simple matter": creditors are best served by the course of action that results in the largest number of creditors being paid the largest amount of money in the shortest amount of time. *Del Monico,* 2005 WL 1129774, at *3. The best interest of the estate, in turn, depends on whether the economic value of the estate is greater in or out of bankruptcy. *In re Staff Inv. Co.,* 146 B.R. 256, 261 (Bankr. E.D. Cal. 1992); *see also In re Clark,* No. 95 C 2773, 1995 WL 495951, at *5 (N.D. Ill. Aug. 17, 1995). The analysis is always case-by-case, and the decision again rests with the court's discretion. *Staff Inv.,* 146 B.R. at 260.

It is clear beyond doubt, first of all, that this bankruptcy case must be dismissed or converted to chapter 7. To leave the case in chapter 11, when the estate is dwindling and the debtors have no reasonable likelihood of rehabilitation or of confirming a plan, is not an option.

As between conversion of the case and dismissal, conversion is the preferable course. Conversion will best serve creditors because more creditors will be paid more money more quickly if a neutral trustee is installed. The trustee can take control of what little remains of the debtors' property and can liquidate it with the interests of the creditors rather than the debtors in mind. He can also evaluate dispassionately the merits of the debtors' many claims, including the claims currently in litigation, and can pursue only those claims that have merit, putting the rest to a merciful end. For the same reasons, conversion is in the best interest of the estate. Administrative costs will be reduced with a chapter 7 trustee in place, and the value of the estate will be greater.

If the case were simply dismissed, on the other hand, the debtors would be left to their own devices. They would be able to liquidate their remaining property and use the proceeds to litigate their claims for their own benefit rather than for the benefit of their creditors. Whatever assets they have would be exhausted in the process. Creditors would likely expend considerable sums fighting with the Reys to no avail. There is no reason to believe either that creditors will be better off or that the estate will be larger outside of bankruptcy. There is every reason to believe the opposite.

In choosing between conversion and dismissal, finally, it should be noted that all of the creditors who have expressed an opinion – Vertrue, NewSub, and UPS Capital – have supported conversion over dismissal. No creditor, secured or unsecured, has preferred dismissal to conversion, nor has any creditor opposed the motion. Creditors are the best judges of what is in

their own best interests; when the creditors agree, "the court should accommodate their desire."

7 L. King, *et al.,* eds., *Collier on Bankruptcy* ¶ 1112.04[6] at 1112-57 (15th ed. rev. 2006).

### 3. Conclusion

For the foregoing reasons, the court finds (1) that there is "cause" to convert or dismiss this case under section 1112(b) of the Code, and (2) that conversion is in the best interests of creditors and the estate. The motion of Vertrue and NewSub is granted. This case is converted to chapter 7. A separate order will be entered in accordance with this opinion.

Dated: August 21, 2006

____/s/ A. Benjamin Goldgar_____
United States Bankruptcy Judge